## CHICAGO, R. I. & G. RY. CO. et al. v. CARTER et al. (No. 7811.)*

(Court of Civil Appeals of Texas. Dallas. Feb. 24, 1923. Rehearing Denied March 31, 1923.)

**1. Master and servant ⟲⟳332(2)—Scope of employment of crossing watchman held for jury.**

In an action against a railroad company for the death of a teamster, who was shot and killed by defendant's crossing watchman as the result of an altercation growing out of decedent's attempt to cross the track in front of an approaching train, the shooting taking place after the train had passed, evidence *held* to make it a question for the jury whether the watchman had departed from his employment to engage in a matter disconnected therewith, or of whether he was acting within the scope of his employment.

**2. Master and servant ⟲⟳302(1)—Master liable for act of servant within scope of employment.**

Where a railroad crossing watchman shot and killed a teamster as the result of an altercation growing out of the teamster's attempt to cross the track in front of a train, a liability on the part of the employer existed to the same extent, regardless of whether the injury resulted from an accident due to negligence and carelessness of the servant or from his intentional act, provided it was so connected with the employment as to support the finding that the servant while inflicting the injury was within the scope of such employment.

**3. Master and servant ⟲⟳330(3)—Railroad held negligent in keeping dissipated and irresponsible crossing watchman.**

In an action for the death of a teamster shot and killed by a railroad crossing watchman as the result of an altercation arising from deceased's attempt to cross the track in front of a train, it appearing that the watchman after the train had passed continued to use abusive language and went to his shanty, where he procured the pistol with which he shot deceased, and that the watchman was intoxicated when arrested, evidence *held* to support a finding the railroad company was negligent in keeping in its employment a man of dissipated and irresponsible character.

**4. Death ⟲⟳14(1)—Railroad company held liable under statute for acts of unfit crossing watchman.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 4694, § 1, authorizing recovery for death inflicted by reason of an agent's unfitness, a railroad company was liable in damages for the death of a teamster shot and killed by a dissipated crossing watchman as the result of an altercation arising from the teamster's attempt

to cross the track in front of an approaching train.

**5. Death ⟲⟳14(2)—Railroad company held liable under statute for wrongful act of crossing watchman.**

Under the express provisions of Vernon's Sayles' Ann. Civ. St. 1914, art. 4694, § 2, a railroad company was liable for the wrongful act of its crossing watchman in shooting and killing plaintiff's decedent as the result of an altercation arising from decedent's attempt to cross the track in front of an approaching train.

**6. Death ⟲⟳99(4)—$13,500 for death of teamster held not excessive.**

$5,000 to a widow, $1,000 to each of two children, 18 and 16 years old, and $3,250 to each of two other children, 11 and 8 years old, *held* not an excessive award for the death of a husband and father who was 52 years old and employed as a teamster earning $12 per week.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Minnie L. Carter and others against the Chicago, Rock Island & Gulf Railway Company and others. From a judgment for plaintiffs, defendants appeal. Affirmed.

See, also, answers to certified questions in 245 S. W. 228.

Phillips, Townsend & Porter, Smith, Robertson & Robertson, and Etheridge, McCormick & Bromberg, all of Dallas, for appellants.

Carden, Starling, Carden, Hemphill & Wallace, of Dallas, for appellees.

HAMILTON, J. This is an appeal from a judgment in a case tried before a jury in which appellees were awarded damages against appellants for $13,500.

Commerce street in the city of Dallas runs in an easterly and westerly direction. At its western terminus is a bridge. In 1914 several railroad tracks intercepted Commerce street at right angles in close proximity to the east end of the bridge on the street. A watchman was kept on duty at this place of intersection for the purpose of warning the drivers of vehicles on the street of the approach of trains on the railroads. An ordinance of the city of Dallas was in effect requiring appellants to keep a watchman at this and similar crossings for the purpose of warning travelers of the approach of trains in order to prevent such persons from coming in contact with trains and engines operated on the railroad. This ordinance required that the watchman should be competent to perform the duties of his position and that he should be kept on duty during such hours as might be prescribed by resolution. By resolution appellant Chicago, Rock Island & Gulf Ry. Co. had been directed to employ a

---

watchman at the intersection on Commerce street where the occurrence out of which this litigation arises took place, and in conformity with which resolution under the ordinance Lesure, the watchman, seems to have been employed.

D. H. Carter, on or about November 9, 1914, while hauling gravel, approached the railroad crossing on Commerce street, and the watchman on duty at the time stopped him just as the team was about to come upon one of the tracks on which a train, at the time engaged in switching in the yard, was moving southward. There is substantial evidence in the record to support the conclusion that the watchman laid hands on the team driven by Carter, backed it away from the track, and used violent and abusive language to and concerning Carter, and that this conduct was continuing when the near approach to the train caused the watchman to step to the west side of the track (Carter with his team and wagon being on the east side) so as to permit the train to pass between them. There is also substantial evidence to the effect that immediately after the train had passed the crossing, the watchman renewed the use of abusive language and applied to Carter vile epithets. In the course of the altercation Carter climbed down from his wagon, and the watchman entered his room or "shanty" but a very short distance from the point at which Carter's progress across the railroad track was intercepted by him. Carter had gone a few feet in the direction of the watchman's station when another driver of a vehicle approaching from the west, and who had arrived at or near the east end of the bridge, called to him not to go to the watchman's "shanty," advising him at the same time that he "might have some trouble." This man testified that—

"Mr. Carter slowed up, kind of slowed up, kind of dropped his head, and studied just a second; dropped his head like that. The next thing I saw of Lesure (the watchman) he came back to the door of the little 'shanty' and stood in it. He had a gun in his hand and shot twice; he shot Carter. There wasn't no other word; wasn't another word said. * * * "

We quote from this witness as follows:

"The flagman caught the rein of the mules and stopped them. The mules were on the track on which this train was at the time he grabbed them. At the time he grabbed them there were about two cars of the train across the T. & P. track. It all happened about the same time. About the time I seen the train and seen Lesure grab the reins, the train was coming across the T. & P. I seen the train and then seen Lesure run in front of the mules; it all happened about the same time. Lesure and Carter got into an argument; they were talking. I was not close enough to understand what was said at the time. I was still driving on towards them. The train kept coming. As the train came

250 S.W.—13

nearer up, Carter began to back his mules up, and when he did that Lesure turned the mules loose, and Carter backed them off the tracks so the train could pass, and the train came by, passing in front of Carter, the way he was going, leaving him the east side of the track. I was on the west side of the track when the train passed. The train passed between me and Carter. Mr. Lesure was on the same side of the track I was on, west side. He backed off to the side in front of my team while the train passed. As soon as the train passed between them, Lesure brought out a big oath and says, 'Let him wait until the train passes and then you can pass.' He says, 'You son of a bitch, you wait until the train passes and then you can cross.' At the time Lesure called him a son of a bitch, Carter was sitting on his wagon, and as soon as he called him that Carter put his foot out on the right-hand front wheel, and as soon as Lesure seen him do that he turned his back on him and went for his shanty in a pretty fast walk. Carter got out of his wagon and came and ran a little past the team, almost in front of my team. I said to him: 'Carter, I wouldn't go out there; you might have some trouble. Go on back and get on your wagon.' Mr. Carter slowed up, kind of slowed up, kind of dropped his head, and studied just a second; dropped his head like that. The next thing I seen of Lesure he come back to the door of the little shanty and stood in it. He had a gun in his hand and shot twice. He shot Carter. There wasn't no other words, wasn't another word said. I didn't hear another word pass between either of them. Carter had done stopped, was standing still when Lesure came to the door of the shanty with a gun. Carter had a wagon whip in his hand, blacksnake whip about wore out, all tore up; had it in his hand like a man would be driving with it. At the time I made those remarks to Carter, he was between 15 and 20 feet from this watchman's shanty, from the door, and when Lesure came to the door with a pistol Carter was still standing where he was when I first spoke to him. At that time Carter was not making threatening gestures of any kind, wasn't saying a word in the world, just standing there, kind of looking at the ground like, studying about something. Lesure fired only two shots. Both took effect. After the first shot was fired, Carter stood there like he wasn't hit, and in just a second Lesure shot him again, and then he staggered forward and fell on his face. He fell, at the corner of the bridge, toward the shanty, flat on the ground. He staggered something like three or four steps further toward the shanty and fell on his face."

From the testimony of another witness the following is quoted:

"At the time of the killing I was going out on the wharf to unload a car of stuff into the store, and there was a freight train that had been up to the T. & P. and was backing in, coming south, and this man was going west on Commerce street, and the gentleman was flagging. We call him 'Dad.' I don't know his name. He was a little fellow, and when I got out of the store he was in front of the team. This man drove his team near to the front track, and Lesure was standing there

in front of Carter's team. He had his hat off. I don't remember whether he had his flag in his hand; and he cursed him just about the time the train was passing on the last track. He called him a son of a bitch. He says, 'I will stop you.' This man pulled his team back off of the track, got off his wagon, and started towards Dad's shanty in this direction, south, and the train had passed, and Dad went on to his little shanty and got in and shut the door. I didn't see Dad shoot him. I heard a couple of shots. When I looked out there at the track, I saw Mr. Carter in his wagon and also saw the train. It was about at the south end of Main street, I believe, about the rear of that building that says, 'Moore & Company' on it. The team was pretty close to the first track and right opposite the store. He was on the track when I first seen him. He pulled the team back off the track. When I first went out, he was on the track nearest Waples-Platter Grocery Company's house. Dad stopped him. He wouldn't let him go across; the team was on the track a little bit, and Carter pulled them back. The train was on the track next to the river. I came out on the walkway; Dad was right in front of this man's team, and had his hat flagging the team, trying to stop them. The man stopped. Dad says, 'You God damned son of a bitch, I will stop you.' Just as he did that, this man pulled his team back and got off his wagon and taken his whip in his hand and went towards Dad, and I walked over to the end of the walk to see what was going to happen, and I heard a couple of shots, just that quick. I never did see Dad shoot him, but I heard the shots. With respect to whether or not Dad said, 'You son of a bitch, I will tell you,' or, 'I will stop you,' before the train had passed or after the train had passed, it was after it had passed. It was about the time the train was passing. That was when Dad got clear of the crossing or mighty near the end of the crossing. Dad went on towards the shanty. When Dad cursed him, Carter stopped his team and says, 'You won't do nothing to me,' and got down on the left side of the wagon and taken his whip. He had his whip in his hand like an ordinary man would drive with it and started towards him. It was a blacksnake whip, and he had the butt end and the lash of the whip both together up in his hand as he went toward the shanty. He was holding it out—I won't say he was holding it perfectly still in his hand, but he didn't have it in a way of hitting. Mr. Lesure went into the shanty and closed the door. Carter went towards the shanty. He had not gotten to the shanty or up in reaching distance at the time the first shot was fired. He was a little bit closer than from here to that heating pipe: it was about four steps, as near as I can remember it, I didn't measure it. While the train was passing there was a wagon on the west side, coming east on Commerce street. It had stopped for the train to pass. It was closer to the track than the man who got shot. There might have been two, but I think there was one, and it seemed to me pretty near to the track. I don't remember whether or not the man who was driving the wagon said anything to Carter. I don't remember how he was dressed, but he was a tall, raw-boned fellow, kind of a lean face. I don't know his name, and I haven't seen him since. Nobody has described him to me. I haven't had any occasion to discuss this with anybody, because that is white folk's business, you know."

Immediately after Lesure shot and killed Carter, he was arrested and, according to the evidence, he was then in a drunken condition. The proof showed that he frequently drank intoxicating liquors while he was at the station or "shanty" which he occupied at times while on duty. The evidence adduced in behalf of the appellees further disclosed that the watchman was addicted to the use of uncouth and abusive language addressed to travelers on Commerce street while discharging the duties imposed upon him by appellants.

The train was a work train which, it seems, was operating in the railroad yards in Dallas. According to the evidence in appellees' behalf, at the time Carter came up to the crossing and the watchman stopped the team by seizing the reins, the train was moving very slowly, proceeding at a rate of not more than six or eight miles per hour, three blocks away. Lesure, the watchman, who was a witness for appellants, testified that he kept a pistol on a shelf in the shanty or house provided for him by appellants on their premises near the crossing as aforesaid. This pistol he kept lying on a shelf, and it was seen there by the appellants' inspector on the occasions of his inspections made at intervals.

The case was submitted to the jury upon special issues, and the substance of the facts found by the jury in response to the questions submitted by the court was substantially as follows:

The jury found at the time Lesure went to the shanty, got his gun, and killed Carter, he was continuing in his duties as watchman to deal with Carter; that the shooting was an unbroken continuation of the controversy; that Lesure was an unfit person to perform the duties required of him as watchman; that his unfitness to perform his duties was the proximate cause of Carter's death; that Lesure was incompetent to perform the duties required of him as watchman; that such incompetence was the cause of Carter's death; that the appellants by the use of ordinary care could have found out prior to the occasion of the tragedy that the watchman was an unfit person to perform the duties of his employment; that the watchman, Lesure, did not kill Carter in self-defense; that Carter was not guilty of any negligence either in his conduct or words upon the occasion of the difficulty resulting in his death. The jury also found that appellees had sustained pecuniary loss on account of the death of D. H. Carter and fixed the amount at the sum above stated.

These questions were submitted in connection with a charge adequately instructing the jury upon the law of negligence appli-

cable to the facts, also in connection with an appropriate charge as to the law of self-defense made an issue in the case, and a proper charge as to the measure of damages as well as to the burden of proof in relation to every issue in the case. The proof adduced, we think, was amply sufficient to sustain the answer made by the jury in response to each question.

Appellants requested the court to give a peremptory instruction to the jury to return a verdict in their favor. The action of the court in refusing to give such peremptory charge is made the basis of the first assignment of error, which is submitted as a proposition.

[1] The theory upon which appellants base their insistence is that the action of the court in declining to give the peremptory instruction was erroneous because the undisputed evidence showed that the watchman was not acting within the scope of his employment, but was acting upon his own responsibility and in the pursuit of his own ends, independent of his employment at the time he killed Carter. Taking the evidence in that light which is most favorable to appellees as it reveals the transaction which terminated in the killing, we do not think there is authority for the position that there can be derived from it only the legal conclusion that Lesure, the watchman, had "put off his character as a servant of appellants and had completely stepped apart from his employment and engaged in a matter altogether separated from and disconnected with his employment." In cases very similar in point of fact it has been said repeatedly by authorities, which are generally relied upon and followed, that the question of whether or not, at the time of a particular act committed by a servant which causes an injury, the servant was acting within the scope of his employment or outside of his employment in pursuit of his own purposes, is a question of fact to be determined by a jury, and that the verdict of the jury is conclusive. These authorities express the view which seems to us to be altogether sound that, whether or not the wrongdoer whose negligence or misconduct causes the injury was acting at the time as the servant of him against whom it is sought to fix liability often depends upon such a variety of facts that it cannot be brought within any definite rule and, accordingly, must be regarded as a question of fact for the determination of the jury. Sharp v. Ry. Co., 184 N. Y. 100, 76 N. E. 923, 6 Ann. Cas. 250; Thompson on Negligence, par. 615; Labatts Master & Servant, §§ 2347 and 2348. "The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon another." Rounds v. Ry. Co., 64 N. Y. 129, 21 Am. Rep. 597; New Ellerslie Fishing Club et al. v. Stewart, 123 Ky. 8, 93 S. W. 600, 9 L. R. A. (N. S.) 475.

In the case last above cited, the Court of Appeals of Kentucky held adverse to the same contention here urged by appellants. In that case the appellant had the exclusive fishing privilege in certain bodies of water. It had an employee whose duties were to prevent persons from fishing who had not been granted the privilege to fish in these waters. Appellee was engaged in fishing in one of the bodies of water in which appellant had the exclusive fishing privileges, and the employee, who, as aforesaid, was charged with the duty of preventing any person from fishing in these waters except such persons as had been granted the privilege, attempted to prevent appellee from fishing and, in so doing, became engaged in an altercation with him, and the result was that the employee assaulted appellee and cut him with a knife.

It was contended in behalf of appellant that the employee when he committed the assault was not acting within the scope of his employment and, for that reason, the fishing club was not liable. In disposing of this contention the court used this language:

"It is difficult to define with accuracy the point at which the master's liability for the acts of his servant ends, but, under the facts of this case, Proctor, when he attempted to prevent appellee from fishing, and when the altercation between them commenced, was clearly acting within the scope of his employment and the assault and battery complained of was merely a continuation of the first act. There was no appreciable length of time between them. Everything that was done happened on the premises under the control of the fishing club, and where Proctor had authority as its agent. Where the agent begins a quarrel acting within the scope of his agency, and immediately follows it up by a violent assault, the master will be liable, as the law under the circumstances will not undertake to say when in the course of the assault he ceased to act as agent and acted upon his own responsibility."

As already said, the evidence in appellees' behalf discloses that the watchman took the lines and stopped Carter's team just as Carter was about to drive upon the track while the train, moving slowly, was three blocks away, and immediately began to use provoking language, which he continued until the close proximity of the train required him to step across the track and separate from Carter, and which he renewed as soon as the train had passed, following this con-

duct immediately by going to the shanty on appellants' premises but a few feet away, and firing the shots which killed Carter. In such circumstances, we think it must be said that the killing was but a continuation of the first act of provocation; that it was intermixed with and inseparable from it; and that, although it was not precisely comprehended in the scope of employment, it was an act within the general course of the business committed to the employee. In this case, as in the case from which we quote above, there was no appreciable length of time between the commencement of the altercation and the violent act of the watchman which ended it. In this case, as in that case, everything that was done took place on the premises under appellants' control, or at least where the watchman had the authority to be under his employment by appellants. In this case, as in that, the acts and conduct of the watchman which provoked the controversy were committed within the general scope of the performance of a duty. Such being the situation, it was proper to submit the issue to the jury, and, the determination of it made by the jury being supported by substantial evidence, their finding cannot be disturbed.

According to the testimony of at least two witnesses, after the train had gone over the crossing, Lesure used language of the most insulting and provocative nature. The evidence tended to show that the movement of the train which took it across the track was but the process of clearing a main track, and that the train was ready to come back across the intersection in going on a siding when the altercation was ended by the shooting. These circumstances, considered together, suggest that the watchman at the time the shooting occurred had not completed the particular duty he assumed to perform in preventing Carter's crossing, and that he proposed by the method pursued to detain Carter's team and wagon until the train passed back across the street on the siding.

[2-5] The fact that the shooting was an intentional act, regardless of what the motive may have been which prompted it, does not affect the rule of liability. Liability exists to the same extent regardless of whether the injury results from an accident due to negligence and carelessness or from an intentional act, provided it is connected with the employment by such circumstances and facts as the jury found from competent evidence to exist in this case. The sufficiently supported finding of the jury, to the effect that appellants were careless in keeping in their employment a man of the dissipated and irresponsible character which the watchman was made to appear to be by the evidence adduced in appellee's behalf, renders the killing an act proximately and directly resulting from appellants' negligence even if there were no other ground of liability. The ordinance of the city seems to determine this in the light of appellees' testimony. We do not believe its validity can be soundly questioned. It charged appellants with the duty of employing a competent watchman. The verdict of the jury, supported by substantial testimony, stamped the employee with the elements of incompetency, which ought to have been known to appellants. The requirements of the ordinance were therefore violated by appellants, and this was negligence, the direct consequence of which was appellants' liability for the injuries arising out of it. But liability exists perforce of the express terms of article 4694, V. R. C. S. The jury's finding, in effect, was that the death was caused by the unfitness of the watchman. Thus the recovery conforms to the provisions of the first section of the above-named article, which authorizes a recovery for death inflicted by reason of an agent's unfitness. The jury also found that the death of Carter resulted from the wrongful act of the watchman. This is a ground of recovery explicitly authorized by the second section of article 4694, appellants both appearing to be corporations.

[6] The complaint against the verdict on the ground that it is excessive cannot be sustained. Fixing the amount of damages in any case of this nature is not an undertaking to be performed by any rule of exactness. Carter was 52 years old at the time of his death; he was earning only $12 per week at the time from which to contribute to the support of his wife and minor children, it is true; but, while $5,000 was awarded to the plaintiff widow, only $1,000 was awarded to each of two of the children and $3,250 to each of the other two. The two who received the $1,000 awards were girls of the respective ages of 18 and 16 years. The two who received the $3,250 awards were of the respective ages of 11 and 8 years. The jury was authorized to consider in the case of the minors, as of pecuniary value to them, not the mere sustenance only, which they received from their father's income, but also the value of whatever nurture, care, training, and similar protection they might have received from him. The facts of the case on this feature, tested by the authority of decisions in this respect analogous, we think sustain the finding of the jury as to the amount of damages, and that, accordingly, the respective awards made by the jury cannot be said to be grossly excessive, and the result of passion, prejudice, or any other improper cause.

We regard as unmeritorious all the assignments of error not specifically noticed in what is said above, and they are expressly overruled.

The judgment is affirmed.