## NORRIS et al. v. CHINA CLIPPER CAFE et al.

### No. 12479.

Court of Civil Appeals of Texas. Galveston.
March 12, 1953.

Rehearings Denied April 16, 1953.

Eugene N. Catlett, Houston (Burris, Benton, Baker & Zwiener, Houston, of counsel), for appellant Marie Elizabeth Norris.

F. Warren Hicks, Houston, for appellant Paula Allman, and for appellees China Clipper Cafe et al.

MONTEITH, Chief Justice.

This action was brought by appellant, Marie Elizabeth Norris, for the recovery of damages from Paula Allman, her husband, and her employers, for an alleged assault on her by Paula Allman. In answer to special issues submitted to it, the jury found that Paula Allman was acting within the scope and course of her employment with the China Clipper Cafe and its owners, and that it did not reasonably appear from the evidence that—from the acts of Mrs. Norris or words coupled with her acts—she was about to make an unlawful attack upon Paula Allman. The jury found that Mrs. Norris had suffered dam-

ages in the sum of $15,300 by reason of the occurrence, made the basis of this suit.

The court granted the motion of appellees China Clipper Cafe, L. C. Foon, Leo Jack, Lim Duck Turn and Yee Leo for judgment non obstante veredicto, and rendered judgment against Paula Allman and her husband, Irving E. Allman, for the sum of $15,300. Both Paula Allman and Marie Elizabeth Norris perfected an appeal from this judgment.

Paula Allman was employed by the China Clipper Cafe as a waitress and was working in that capacity on August 26, 1950. In that cafe each waitress was assigned certain tables and booths and was supposed to serve the food and perform the regular duties of a waitress on the tables within her station. On that date, at about 11:30 p. m., the Norris party arrived at the China Clipper Cafe and were seated at one of Paula Allman's tables. Mrs. Norris and her former husband, Ernest Norris, were married earlier that day and then went to the Auditorium Hotel, where they remained for two or three hours talking and drinking, and from there they went to the Rex Bar, and later to the China Clipper Cafe, where they were seated at one of Paula Allman's tables. A short time thereafter Paula Allman told Lee Foon, one of the owners of the cafe, that she was having trouble with the Norris party and requested him to assign another waitress to that table. L. C. Foon testified that he assigned the Norris party's table to another waitress, and that Paula Allman continued to work the other tables in her station, and that when Mrs. Norris called Mrs. Allman a son of a bitch they started to fight.

Mrs. Francis Johnson, mother of Mrs. Norris, testified that on the night of the wedding of Mrs. Norris and her former husband, Ernest Norris, the waitress, Paula Allman, had some words about a cup of coffee and that there were also some words between the waitress and Mrs. Norris in regard to some crackers and that the Chinaman sent them a new waitress who took over the table and waited on them; that Paula Allman continued to wait on other tables in the area and would throw snarls at them. That there were also some

words about the steak that was served them, and that Mrs. Allman turned around and called Mr. Norris a "pimp." Mrs. Johnson testified that they had a highball at the Auditorium Hotel and that they stayed at the Auditorium Hotel three or four hours; that the bellhops at the hotel were friends of Mr. Norris and that they gave them a pint of liquor that they used for the highballs. She testified that they went to the Rex Bar, and from there, to the China Clipper. That the waitress brought the other cup of coffee and said she ought to throw it in Marie's face.

Mrs. Pulaski, an aunt by marriage of the plaintiff, testified that she was in the Norris party; that some beer was drunk at the Town Lounge; that from there they went to the Rex Bar where they stayed around two hours and drank a few beers; that they stayed three hours in the Town Lounge; that they drank a few beers at the Rex Bar and then went to the China Clipper, where they arrived around 11:30. That she was not present when the incident occurred.

W. B. Sutton testified that he was a member of the Norris party on the night in question; that after the wedding they went to the coffee shop in the hotel and had coffee and then went to a tavern and had a few beers and then to the Talk of the Town; that after they got through drinking a few beers they went to the China Clipper Cafe, where they stayed until all this "static" happened. That Paula Allman came by their table and was "popping off", and Mr. Norris went and asked for another waitress to serve their table. That he saw the blonde catch Mrs. Norris by the hair of her head and hit her at the same time.

Mrs. Joyce Anderson testified that she was sitting with her husband in a booth next to the Norris table in the China Clipper Cafe; that they arrived at the China Clipper around 12:15 and were seated in a booth, and the Norris table was next to their booth; that when they went in, the Norris party was already in the cafe and that the table was close enough for her husband to touch it. That when they arrived the blond waitress was waiting on the Norris table; that she was extremely nice and courteous to them and that the Norris party, under the influence of liquor, were loud, drunk and real nasty the way they talked to the waitress; that everybody in the cafe was looking at them when they changed waitresses, when the dark-headed girl took over; that after they changed waitresses Mrs. Allman continued to pass by the table in serving other patrons in her station; and that Mrs. Norris called Mrs. Allman a blonde hussy and then called Mrs. Allman a blond bitch and a peroxide whore; that Mrs. Allman got Mrs. Norris by the hair and Mrs. Norris slid out of her chair onto the floor, that when Mr. Norris attempted to strike the waitress, her husband got up and told him he would "knock hell out of him" if he tried to hit the waitress and that about that time a policeman came up and took charge. That Mrs. Norris' mother said: "that's my daughter", and Mrs. Allman said she was a mother too and she didn't like the names they called her. B. A. Anderson, the husband of Mrs. Joyce Anderson, verified her statements.

Alvin Harrison, a witness on behalf of defendants, testified that on the night of August 26, 1950, he was in the Rex Bar; that he went there about 11:30; that he saw the Norris party at the Rex Bar and later saw them at the China Clipper Cafe. That at the Rex Bar there were whiskey and beer bottles on their table; that he heard the waitress at the Rex Bar tell them that she could not serve them any more beer.

Marie Elizabeth Norris testified that she was married at 7:00 that evening and that they went to the Auditorium Hotel, and from there to the Talk of the Town, where they had a few drinks; that she drank a highball and that her husband was drinking. That from the time Mrs. Allman was taken off their table until she grabbed her by the hair of her head, at least twelve minutes had passed. She testified that when her husband asked for crackers Mrs. Allman said: "I will bring them when I get time." * * * "I know you are a bellhop, you are a pimp at the Lamar Hotel." That Mrs. Allman was removed as a waitress and that she said nothing

after that before Mrs. Allman grabbed her by the hair of her head. That she had been charged with being drunk on March 20, 1952, and paid a $5.00 fine; that on the night of her wedding, she was drinking but was not intoxicated but she didn't know about her husband as she didn't know how much he could hold.

Mrs. Paula Allman, who, at the time of the trial resided in San Diego, California, testified by written deposition that on the night of August 26, 1950, she was working at the China Clipper Cafe as a waitress; where she had been employed for about a year and that she continued to work there until October, 1950, and left on account of illness. That on the night of August 26, 1950, she waited on a table in the China Clipper Cafe occupied by the Norris party; that she had never seen them prior to that night; that on the night in question her duties were limited to taking orders from customers and waiting on customers in a certain portion of the cafe; that she had four booths and five tables, and that plaintiff and her party came into the cafe between 12:30 and 1:00 a. m.; that she gave them a menu and water and took their orders and Mr. Norris kept insisting that she bring them some crackers; and she explained to him that she was very busy and that she would get them some crackers as soon as possible; that Mrs. Norris made some very nasty remarks to her and said, "if you don't hurry up and bring our crackers, would you like to have this catsup bottle?" That she requested Mr. Foon, the manager, to assign another waitress to the table because Mr. and Mrs. Norris were so nasty and because she realized she could not take Mrs. Norris' remarks much longer; that after she had been relieved of the duty of waiting upon the Norris party, she had to pass by their table to wait on other tables in her station; that when she passed by the Norris table, Mr. Norris would speak to his wife in a tone that most everyone could hear and say: "Who does she think she is?" and "Look at that hair," and he yelled across to her customers and said: "Don't let her do you this way. She has been giving me hell all night." That Mr. Norris made another remark to her and

that she asked him to leave her alone and that she didn't have their location any more and said: "After all, you know you are only a bellhop. You aren't Mr. Mc-Carthy and I don't have to take this kind of stuff from you," and that he said, "If you don't like the way we are doing we can take you outside," that she told him she had a husband that did her fighting for her and he said if I didn't want to go outside he would kick me through the doorway, and Mrs. Norris said, " * * * you are nothing but a peroxide whore, anyway," and that she put the dishes down and got Mrs. Norris by the hair of her head and pulled her up to her to tell her what she thought of her. That Mrs. Norris kept reaching for the catsup bottle to hit her; that she couldn't reach it and was sitting half on and half out of the chair and became unbalanced, and when she turned her loose, she fell; that Mr. Norris jumped up and started to hit her and a customer sitting in a booth near their table prevented Mr. Norris from striking her. She testified that she had never in her life had any difficulty with a patron before this incident. She testified that Mr. and Mrs. Norris were under the influence of liquor on that occasion. That she told Mr. Foon, the manager, the party was getting out of hand; that they were using bad language and that she would rather not wait on them any longer.

In the case of Texas & Pacific Ry. Co. v. Hagenloh, Tex.Sup., 247 S.W.2d 236, 239, in which the facts are similar in many respects to the facts in this case, the controlling question presented was whether—in striking the plaintiff Paul Hagenloh—C. B. Houghland, an employee, was acting within the scope of his employment. Houghland was a special agent for the railway company; plaintiff worked as a brakeman and baggageman for the company. It was Houghland's duty to protect all the company's property and to investigate trespasses, personal injuries and claims for damages. When claims were made of missing baggage, it was his duty to take care of all claims and to undertake to find the missing property. At about Christmas, 1946, Houghland entered the baggage car

which was in charge of plaintiff to make an inspection. He later met the plaintiff on the street and a heated discussion ensued regarding the missing baggage, which terminated in the assault. On the trial of the case, the jury found that when Houghland accosted plaintiff, he did so in performance of one or more of his duties, as agent of the company and that he was on duty at the time. The Court of Civil Appeals, after reviewing the evidence, reached the conclusion that a jury issue was raised and affirmed the judgment. In reversing and rendering judgment, the Supreme Court said, "After careful examination of the record and the applicable authorities, and bearing in mind the rule stated at the beginning of this opinion for testing the evidence in the consideration of a motion for peremptory instruction, we are of the opinion that it is not reasonably to be inferred from Houghland's words and conduct on the night of the assault as described in respondent's testimony, or from that testimony and any other evidence in the record, that Houghland in accosting respondent and assaulting him was acting within the scope of his employment or in pursuance of his duties or in the furtherance of petitioner's business."

Continuing, the court said, "It is true that the assault may be traced back to Houghland's performance of his duty to investigate the loss of the jewelry, but that investigation was the remote cause of the personal encounter, and the encounter and assault were not so closely related to the investigation in time or in place as to be a part of it."

In the case of Galveston, H. & S. A. Ry. Co. v. Currie, 100 Tex. 136, 96 S.W. 1073, 10 L.R.A.,N.S., 367, the Supreme Court of Texas announced the rule when the servant turns aside, for however short a time, from the prosecution of the master's work, to engage in an affair wholly his own, he ceases to act for the master, and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone.

If it be assumed that when Houghland first accosted respondent he was continuing his search for missing jewelry and was pursuing petitioner's business, and that his act in striking respondent after respondent said, "That is a lie", was a clear departure for the time from the service of petitioner to engage in an act of violence in his own behalf and in resentment of a personal insult. It is not reasonably to be inferred that the blow was struck as a part of the search for the missing jewelry. Houghland had told respondent that he was a thief and should be in the penitentiary, and added that Judge Schmidt told him. Respondent said, "That is a lie", and Houghland immediately struck respondent, pursued him, and struck him again. If it be assumed that at the beginning of the encounter Houghland was in the course of the master's service, he stepped aside from that service in anger and in resentment, not in play as in the Currie case. By the same principle, however, his act when he stepped aside and struck respondent was his act and not that of his employer.

In the case of Greathouse v. Texas Public Utilities Corporation, Tex.Civ.App., 217 S.W.2d 190, 192, refused, n. r. e., the trial court rendered judgment for defendant non obstante veredicto, which was affirmed by the appellate court. The court announced the rule applicable as stated by Judge Alexander while a justice of the Court of Civil Appeals at Waco, in the case of Central Motor Co. v. Gallo, 94 S.W.2d 821, 822, to be that:

"'"If the act complained of was within the scope of the servant's authority, the master will be liable, although it constituted an abuse or excess of the authority conferred. The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on a third person." 39 C.J. page 1285, § 1476.

" 'The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do.'

"In said case, an argument arose between the service manager of a garage and a customer over work done in the garage on the customer's automobile. The service manager struck the customer, severely injuring him. The master was held liable. It should be noted that the assault took place in the shop and directly grew out of the price charged for the work or the quality of the work done; that no appreciable time elapsed from the beginning of the dispute until the assault; that said service manager undoubtedly had authority in the matter in dispute and the subject matter of same was of direct concern to the master."

After thus announcing the law in the Greathouse v. Texas Public Utilities Corporation case, supra, that court reviewed this court's and the Supreme Court's opinion in the Houston Transit Co. v. Felder Case, 146 Tex. 428, 208 S.W.2d 880, and said: "We note that when Goodson went back to Felder's car to get certain information, he was performing a duty and carrying out instructions incident to his employment. He was clearly acting for his master and about his master's business. Here, as in the Gallo case, supra, it all happened in so short a time, and was so closely connected with the performance of Goodson's duties for his master, as yet unfinished, as to prevent the conclusion as a matter of law, that when he struck Felder, he had embarked upon a mission of his own."

The court then proceeded to review the case of Chicago, R. I. & G. Ry. Co. v. Carter, Tex.Com.App., 261 S.W. 135, and after reviewing the facts, the court said: "The facts in said case are not analogous to the facts in this appeal, as will appear from the following excerpts from the Commission of Appeals' decision [261 S.W. 136]:

" 'The jury found that at the time the flagman went to the shanty and got his gun and killed Carter he was continuing in his duties as watchman to deal with Carter, and we understand the law to be that, if there was any substantial evidence upon which to predicate such a finding, the verdict of the jury cannot be disturbed by this court, regardless of what our opinion is as to the real facts. The Court of Civil Appeals [250 S.W. 192] in their opinion say:

" ' "The evidence tended to show that the movement of the train which took it across the track was but the process of clearing a main track, and that the train was ready to come back across the intersection in going on a siding when the altercation was ended by the shooting."

" 'And we are bound by this finding of fact, and, as stated, after the train had passed, the flagman was still cursing the teamster, which would tend to show that the flagman was still trying to keep the teamster from crossing the tracks until the train had recrossed the street after going on the siding. That the teamster was clearly acting within the scope of his employment at the time the personal controversy began there can be no doubt, and the facts also clearly show that the difficulty was a continuous one from the time it began until the shooting, as found by the jury. The whole time of the difficulty was very short, and it would be extremely difficult for us to determine just when the flagman ceased to act within the scope of his employment and began to act as his own master, if he was so acting at the time of the shooting, and under the peculiar facts of this case we do not think that the law can undertake to say just when the flagman ceased to act as agent, or that he did so cease, but that the finding of the jury on that matter should govern.' "

The case of National Life & Accident Ins. Co. v. Ringo, Tex.Civ.App., 137 S.W. 2d 828, 829, writ denied, is in point. Brown was an employee of said company with authority to collect premiums and credit same in receipt books. Brown called at the Ringo home, made a collection and credited

same upon duplicate receipt books, one of which was kept by the family. A dispute arose between Ringo and Brown as to whether the payment made was for one week, two or three weeks. Brown was. told to leave and not return. He told Ringo to "Come on outside and we will just fight it out." Ringo did so and was injured. On trial Ringo prevailed, but the Court of Civil Appeals reversed and rendered same in favor of the insurance company, holding that Brown's authority was limited to collecting and receipting for premiums and that he was not authorized to settle and adjust differences arising in the course of his employment.

Consistent with the principles announced in the above-cited authorities, we hold that no liability attached to the China Clipper Cafe and its owners under the facts in this record. The judgment of the trial court is accordingly affirmed.

Affirmed.